UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| VILLAJE DEL RIO, LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) Civil Action No. SA-07-CA-947-XR |
| | ) |
| COLINA DEL RIO, LP, *et al.* | ) |
| | ) |
| Defendants. | ) |

# ORDER

On this date, the Court considered Defendant DBBM's Motion to Strike Plaintiff's Designation of Solvency Experts (docket no. 90) and the response and reply thereto.

## I. Factual Allegations and Procedural History Relevant to this Motion[1]

The events leading to this lawsuit relate to a failed construction project and the subsequent bankruptcy of the project's owner and developer, Villaje Del Rio, Ltd. ("Villaje"). According to George Geis[2], on February 13, 2003, Villaje executed a non-recourse deed of trust note in the amount of $26,747,700.00 payable to Berkshire Mortgage Finance Limited Partnership, DBBM's predecessor. The proceeds of the note were to be used to finance the construction of a large multi-use residential, office and retail development in San Antonio, Texas. The note was underwritten for project mortgage insurance by the Department of Housing and Urban Development ("HUD"). Geis

---

[1] This case has an extensive and complex procedural history. A comprehensive summary of the allegations and procedural background in this case is contained in the Court's Order granting DBBM's Motion for Summary Judgment (docket no. 82).

[2] George Geis, the principal of Villaje, purchased Villaje's claims from Villaje's trustee in bankruptcy. Geis thus assumed Villaje's position as the Plaintiff in this action. The fraudulent conveyance cause of action that is the subject of this Order, however, is asserted by Geis in his individual capacity as an unsecured creditor of Villaje.

also personally loaned Villaje $1,500,000.00 to finance the project.

Under the construction contract between Villaje and its general contractor, Andres Holding Corporation ("Andres"), Villaje was to pay each month to Andres, from the proceeds of DBBM's loan to Villaje, an amount roughly proportional to the percentage of construction completed during the prior month. Some time after construction began, Villaje reached an impasse with its general contractor, Andres. In order to complete construction, Andres allegedly requested from Villaje funds in excess of the amount originally stated in the construction contract and loan documents. Villaje then refused to authorize Andres's successive monthly requests for construction funds, payable from amounts DBBM agreed to lend Villaje. Villaje alleges that DBBM, in turn, wrongfully threatened to declare Villaje in default of the promissory note unless Villaje began to approve Andres's requests. Villaje subsequently approved multiple requests for funds from Andres. Some time after, Villaje terminated Andres from the project. Villaje did not find another general contractor before DBBM declared Villaje in default of the note and assigned the note to HUD, who sold the note to Colina del Rio, LP ("Colina"). Villaje eventually declared bankruptcy, and Colina foreclosed on the lien.

Prior to filing bankruptcy, Villaje instituted this lawsuit in state court, asserting causes of action against multiple Defendants, including claims against DBBM for economic coercion and tortious interference of contract.[3] DBBM, in turn, asserted counterclaims against Villaje and third-party claims against George Geis, Geis Construction, and Goldbrick, Inc. for fraud and misuse of funds. DBBM also sues Geis under an alter-ego theory for the claims it asserts against Villaje, Geis

---

[3]On March 5, 2009, the Court granted summary judgment in favor of DBBM on these causes of action. *See* docket no. 82. Geis's motion to reconsider this ruling is pending before the Court. *See* docket no. 86.

Construction, and Goldbrick, Inc. After Villaje declared bankruptcy, the case was removed to the bankruptcy court, wherein Geis purchased Villaje's litigation claims from Villaje's trustee in bankruptcy. The case eventually found its way to this Court, wherein Geis amended the complaint to assert, in his individual capacity as a creditor of Villaje, a claim against DBBM for recovery of fraudulent conveyances under TEX. BUS. & COM. CODE §§ 24.005(a)(2) and 24.006(a).[4] Geis alleges that DBBM, by forcing Villaje to approve Andres's requests for payments, overpaid Andres by more than $2.8 million, as measured by the percentage of construction Andres actually completed. Geis asserts that such overpayments constitute fraudulent conveyances under § 24.005(a)(2) because, by such payments, "Villaje incurred an obligation without Villaje receiving reasonably equivalent value in exchange for the obligation, and Villaje was engaged in a business or a transaction for which the remaining assets of Villaje were unreasonably small in relation to the business or transaction, and/or Villaje incurred debts beyond its ability to pay as they became due as a result of the obligations incurred to DBBM because there were not sufficient funds under the Note to complete construction."[5] Additionally, Geis asserts that such overpayments constitute fraudulent conveyances under § 24.006(a) because, by such payments, Villaje "failed to receive reasonably equivalent value in exchange for the obligations incurred and/or ... the obligations were incurred at a time when Villaje became insolvent (in that it ultimately could not pay creditors as debts became due) as a result of the additional obligations incurred."[6] Geis thus seeks judgment voiding such obligations in an amount sufficient to pay Geis's unsecured claim against Villaje.

---

[4] *See* Pl's First Am. Compl. (docket no. 31) ¶¶ 27-31.

[5] *Id.* ¶ 29.

[6] *Id.* ¶ 30.

3

To summarize the claims pending in this action, Geis asserts claims for recovery of fraudulent conveyances against DBBM. DBBM asserts counterclaims against Villaje and third-party claims against George Geis, Geis Construction, and Goldbrick, Inc. for fraud and misuse of funds. DBBM also sues Geis under an alter-ego theory for the claims it asserts against Villaje, Geis Construction, and Goldbrick, Inc.

## II.     The Amended Scheduling Order

After the Court granted summary judgment on the economic coercion and tortious interference claims, the Court granted a continuance of the trial date. The parties jointly proposed an amended scheduling order, which the Court entered, and which set discovery and dispositive motion deadlines limited to Plaintiff's fraudulent conveyances claim. Specifically related to this motion, the Amended Scheduling Order provided that Plaintiff and Defendant may designate solvency expert(s) but that no other discovery would be permitted unless agreed to by the parties or with leave of court.[7]

## III.    Geis's Designations of Expert Witnesses

Prior to the Court's Order granting summary judgment in favor of DBBM on Plaintiff's economic coercion and tortious interference claims, Geis filed his original designation of expert witnesses.[8] In his original designation, Geis designated:

(1)   Paul Hornsby as a retained expert who was "to provide valuation and damages testimony";

(2)   John Bratton, the supervising architect for the project, as a non-retained expert who "may provide testimony concerning the state of completion of the Villaje del Rio

---

[7] *See* docket no. 85 ¶ 2.

[8] *See* docket no. 38.

project at the times of the Draw Requests/Pay Requisitions submitted for the project";

(3) David Neuberger, construction consultant for the project, who "prepared a report dated November 5, 2004, with an accompanying video, in which he described the state of the Villaje del Rio project and construction, including the percentage of completion";

(4) Martyn Glen, who prepared an appraisal dated August 15, 2002 and consultation report dated July 15, 2001 for DBBM, who "may provide testimony concerning the value of the project, income and expense projections, operating income/profit potential for the project, and real estate values and lease rates in the San Antonio market";

(5) Martha Lindley, a former employee of Integra Realty who assisted Mr. Glen in preparation of the August 15, 2002 appraisal and July 15, 2001 consultation report, who "may provide testimony concerning the value of the project, income and expense projections, operating income/profit potential for the project, and real estate values and lease rates in the San Antonio market";

(6) George Geis, the Plaintiff and "representative of the project owner," who "will provide testimony concerning damages, the property value, the San Antonio real estate and leasing market for projects such as Villaje del Rio, and construction issues, including, but not limited to, the percentage of completion of the project at various times[,] .... the amounts of overpayments and improper payments to ANdres [*sic*], and the lack of value received by Villaje del Rio"; and

(7) Russ Deason, construction consultant retained by HUD to evaluate the project, who "may provide testimony concerning his evaluation of the construction and percentage of completion of the project."[9]

On April 8, 2009, with only the fraudulent conveyance claims pending, Geis filed an amended designation of expert witnesses.[10] Geis stated in the amended designations that he "continues to rely upon the prior designation of experts made in this proceeding, as many of those persons will provide testimony as to the construction issues and status of construction that relate to

---

[9]*Id.* at 1-3.

[10]*See* docket no. 88.

the issue of whether overpayments occurred."[11]  "With respect to the solvency issue specifically," Geis also designated as non-retained experts three individuals: George Geis, Martyn Glen, and Martha Lindley.[12]  Describing his own testimony, Geis repeated the description set forth in the original designations but added that he "will also testify as to the financial condition of Villaje, including its assets, liabilities, and cash flow, as of the dates of the overpayments/improper payments.  Mr. Geis will testify, among other things, that the overpayments/improper payments left Villaje without the ability to pay for the completion of the project, that the project value, as partially completed, was less than the debt, and that the overpayments/improper payments left Villaje without the ability to pay its debts as they became due."[13]  Geis did not alter the description of the testimony of Glen or Lindley previously provided in his original designation.[14]

## IV.  Analysis

### A.  George Geis

DBBM objects to the proposed testimony of George Geis on the ground that it cannot meet the standard for admissibility of expert witness testimony as articulated under Federal Rule of Evidence 702.  That Rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3)

---

[11]*Id.* at 1.

[12]*Id.*

[13]*Id.* at 1-2.

[14]*Id.* at 2.

the witness has applied the principles and methods reliably to the facts of the case. FED. R. EVID. 702. A trial court has considerable discretion to admit or exclude expert testimony under the Rule. *See Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 138-139 (1997).

DBBM argues that, although Geis may have personal knowledge regarding his anticipated testimony, he is not qualified to testify as an expert on solvency by knowledge, skill, experience, training, or education. Further, DBBM argues that permitting Geis to testify as an expert will confuse the jury and will cause the jury to give undue significance to his testimony.

In response, Geis does not attempt to establish that he has any general expertise, through knowledge, skill, experience, training, or education, in matters of solvency, financial evaluation, accounting, or the like. Rather, Geis argues at length regarding his personal knowledge of Villaje's "financial condition" based on his experience managing Villaje's operations. For example, Geis states:

- "Plaintiff has designated Mr. Geis as the person who is most familiar with the books, records, and financial condition of Villaje Del Rio, Ltd., at the time the transfers were made, as the person to provide the testimony relevant to the issues under the Texas Uniform Fraudulent Conveyance Act."[15]

- "Villaje Del Rio, Ltd. is a Texas limited partnership. The general partner of that entity is Villaje Management, LLC, a limited liability company. Mr. Geis owns Villaje Management, and was the sole limited partner of Villaje Del Rio, Ltd. Mr. Geis oversaw all activities of Villaje Del Rio, Ltd., and Villaje Management, and was its only 'principal', officer or agent. Accordingly, not only is Mr. Geis intimately familiar with the financial condition of Villaje Del Rio, he is the person most uniquely qualified to testify on these matters."[16]

- "Mr. Geis' [previously filed his] analysis of the overpayments and excess payments to Andres. DBBM has also questioned Mr. Geis about these issues at his deposition

---

[15] Pl.'s Resp. to Def.'s Mtn. to Strike Designation of Solvency Experts (docket no. 93) ¶ 2.

[16] *Id.* ¶ 5.

7

in January of this year. Mr. Geis will testify that, because these were overpayments or payments to which Andres was not entitled, they give no value to the project or to the debtor because they are payments that should not have been made. With respect to the financial condition of the debtor, Mr. Geis will testify that the general partner had no assets other than its ownership interests in Villaje Del Rio, Ltd., and that Villaje Del Rio, Ltd., had no assets other than the project at issue in this case. Mr. Geis will also testify, as set forth previously in his affidavit in response to DBBM's Motion for Summary Judgment, that the overpayments rendered the project out of balance by the amount of the overpayments. Mr. Geis will testify that there were no assets in the general partner or the limited partnership to cover the gap that was created by the overpayments. Mr. Geis will also testify that the lack of funding caused by the overpayments rendered Villaje Del Rio incapable of paying its debts as they became due (as evidenced by its bankruptcy filing), and may also provide testimony concerning the value of the project."[17]

The issue of solvency is relevant to Geis's fraudulent conveyances claim because the debtor's insolvency is an element of the cause of action he asserts under TEX. BUS. & COM. CODE § 24.0006(a). *See* TEX. BUS. & COM. CODE § 24.0006(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.").[18]

---

[17]*Id.* ¶ 6.

[18]Plaintiff also proceeds under § 24.005(a)(2), which does not necessarily require a showing of insolvency. *See* TEX. BUS. & COM. CODE § 24.0005(a)(2) ("(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."). Nevertheless, because Plaintiff asserts a cause of action under § 24.006(a) and because Plaintiff designates purported solvency experts, we must consider the purported experts' qualifications to testify as solvency experts.

Although Geis may have demonstrated that he possesses sufficient personal knowledge to testify as a lay witness regarding facts related to the issue of Villaje's solvency, Geis fails to establish under Rule 702 that he is qualified to testify generally as an expert on the financial solvency of an entity such as Villaje. "[T]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir.2008) (quoting FED. R. EVID. 701, Advisory Committee Notes to 2000 Amendments). "'[T]o qualify as an expert, the witness must have such knowledge or experience in [his or her] field or calling as to make it appear that his opinion will probably aid the trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir.1992)). An expert's testimony is admissible even though the expert possesses general rather than specific experience with the subject matter. *See Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003) (qualifying a certified public accountant with 17 years experience as an expert on the issue of insolvency despite lack of prior experience in the health care industry or experience analyzing healthcare receivables).

Geis does not argue or allege facts that would suggest that his testimony results from a process of reasoning which can be mastered only by specialists in any field. Rather, Geis's proposed testimony is merely descriptive of events he observed while supervising Villaje's operations. *See id.* (concluding that testimony that was "merely descriptive" of witnesses operations was properly categorized as "lay"); *Cf.*, *Air Center, LLC v. XL Specialty Ins. Co.*, Civil No. SA-03-CA-61-FB, 2005 WL 5979097, at *2-3 (W.D. Tex. July 8, 2005) (Primomo, M.J.) (excluding expert testimony of sole owner of plaintiff regarding "the company's value and its loss of future profits" where

9

plaintiff argued that owner was "qualified to testify as an expert" because the owner was "intimately familiar with his business"). Moreover, nowhere does he argue that he has any expertise, through knowledge, skill, experience, training, or education, such that he is qualified to testify as an expert generally on issues related to solvency. The Court thus GRANTS the motion to strike the expert designation of George Geis because Geis fails to establish that he is qualified to testify as an expert generally on the issue of solvency and Geis further fails to establish that his proposed testimony is of an expert nature.

The Court notes that, in response to DBBM's motion, Plaintiff does not attempt to establish Geis's expert qualifications, but rather argues essentially that Geis is qualified to testify as a lay witness on the issue of Villaje's solvency. *See* docket no. 93 at 3-4 ("[W]hether the testimony is considered under Rule 701 or 702, the testimony of a business owner on issues relating to the financial condition of the company is admissible."). This Order does not limit Geis's ability to testify as a lay witness regarding Villaje's solvency.

**B.    Martyn Glen and Martha Lindley**

DBBM argues that Geis's designations of Martyn Glen and Martha Lindley as experts on solvency must also be stricken. Geis asserts in the amended complaint that the purported overpayments to Andres that constituted fraudulent transfers occurred between June 2004 and October 2004. Geis's designation indicates that Glen and Lindley are qualified to testify regarding Villaje's solvency based on reports and appraisals prepared in 2001 and 2002 – during the underwriting phase of the loan. Because the reports were prepared long before the alleged fraudulent transfers occurred, DBBM argues Glen and Lindley cannot have considered facts, data, or issues pertaining to Villaje's solvency between June 2004 and October 2004. As such, DBBM argues, their

10

testimony will not apply reliable methodologies for determining Villaje's insolvency during the relevant time, as required by Rule 702, and therefore will not be helpful to the fact-finder in determining whether Villaje was insolvent during the relevant period.[19]

In response, Geis argues that Glen and Lindley appraised the value of the construction on an as-completed basis, albeit in 2001 and 2002 before construction commenced, and that their testimony will be relevant to the extent that there is a dispute as to whether the debt exceeded the value of the property when taking into account the overpayments. Geis did not provide the Court with a copy of the 2001 and 2002 reports. The Court therefore analyzes the parties' arguments based on the information regarding Glen and Lindley's data and methods provided in the parties' pleadings.

Rule 702 permits an expert to testify "in the form of an opinion or otherwise, if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993)). The district court's responsibility is "to make certain that an expert, whether basing testimony upon

---

[19]Although the Court is uncertain whether Glen or Lindley can qualify under Rule 702 to testify as experts in the field of solvency, the Court will not examine those issues as they are not before the Court.

professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The Court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004). In making its reliability determination, the court should not decide the validity of the expert's conclusions, but instead consider the soundness of the general principles or reasoning on which the expert relies and the propriety of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594-95; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997).

The Texas Uniform Fraudulent Transfer Act ("TUFTA") provides the standards for determining whether a debtor is insolvent at the time of a given transfer or conveyance or became insolvent as a result of the transfer or conveyance:

> (a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
>
> (b) A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.
>
> (c) A partnership is insolvent under Subsection (a) of this section if the sum of the partnership's debts is greater than the aggregate, at a fair valuation, of all of the partnership's assets and the sum of the excess of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts.

TEX. BUS. & COM. CODE § 24.003. The fact-finder will be charged with weighing the value of Villaje's assets against the value of its debts at the time of each purported overpayment. *See id.* § 24.003(a), (c). The project was one of, and perhaps the only asset Villaje had at the time of the transfers. Accordingly, the value of the project during this time period will be directly relevant to

12

the solvency issue.

The issue thus presented is whether Glen and Lindley's proposed testimony, based on knowledge acquired prior to construction while preparing the 2001 and 2002 appraisals, may assist the fact-finder in determining the "fair valuation" of the project at the time of the alleged overpayments that occurred between June 2004 and October 2004. *See id.*; FED. R. CIV. P. 702. Under Texas law, the question of insolvency is to be determined at the time of the conveyance. *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App.–Tyler 2000, pet. denied). Nevertheless, to prove a fraudulent conveyance claim, there may be situations in which a plaintiff need not present evidence as to the *exact* value of the debtor's assets and liabilities at the time of the transfer. In *Jackson Law Office*, for example, the reviewing court determined that a jury had sufficient evidence to sustain a finding of insolvency, based on a valuation of assets and debts some time prior to the alleged fraudulent transfers. The court reasoned:

> In her second subpoint, Chappell argues that there is no evidence that the transfers rendered her insolvent. We note, however, that the relevant question is whether she was insolvent at the time of the transfers. After reviewing the evidence, we find that the jury could have concluded that when each of the transfers was made, Chappell's debts far outweighed her assets. Prior to the first transfer, Chappell was approximately $648,734.00 in debt, but the value of her assets was considerably less, at approximately $431,830.00. Nothing in the record indicates that Chappell's assets or debts changed to such an extent that she became solvent at any time before trial. Furthermore, during trial, Chappell admitted that throughout the relevant time period, she had expenses which exceeded her ability to pay. We hold, therefore, that the evidence is both legally and factually sufficient that Chappell was insolvent when she executed a promissory note on the Tyler house and gave a portion of the proceeds from the sale of timber to Moreau and when she transferred the Anderson County house and land to Kennington.

*Id.* at 26.

*Jackson Law Office*, however, is readily distinguishable. In that case, the jury received

13

evidence of the value of the debtor's *actual* assets and liabilities prior to the relevant time period, and the record did not indicate that any significant change occurred prior to the relevant transfers. Geis, to the contrary, does not contend that Glen and Lindley's reports show the value of the construction project in the incomplete state of the project between or just prior to June 2004 and October 2004. Rather, Geis contends that Glen and Lindley can offer opinions as to the value of the project on an "as-completed" basis – a state which the project never reached. It is illogical to expect that the value of an uncompleted construction project can be fairly represented by a projection of its value in a completed state and at a later time.

A further distinction from *Jackson Law Office* is that Glen and Lindley, in forming their opinions in 2001 and 2002, could not have relied upon *actual* data which reflects the debtor's assets and liabilities between or just prior to June 2004 and October 2004. Even if the reports and appraisal somehow purport to value the construction project at various stages of completion, which Geis does not contend[20], the data Glen and Lindley relied upon could be, at best, mere projections, and not actual data.

Given the foregoing problems, the Court cannot say from the information provided in Geis's designation or response brief that Glen or Lindley's opinions are supported by sufficient facts or data or that they rely upon reliable principles or methods for determining the value of the construction project at the time of the overpayments.[21] Because Geis has failed to satisfy his burden to establish

---

[20]Geis, who has the burden of proving Rule 702 is satisfied, did not provide for the Court a copy of Glen and Lindley's report and appraisal or data relied upon in preparing the reports.

[21]Moreover, Geis did not even attempt to argue or establish through evidence that Glen and Lindley's "facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" of the value of a construction project prior to completion of the project. FED. R. CIV. P. 703.

by a preponderance of the evidence that the proposed expert testimony is reliable or relevant, the Court GRANTS DBBM's motion with respect to Glen and Lindley as solvency experts. Geis's designation of Glen and Lindley as solvency experts shall be stricken.

C.     **Witnesses Named in Plaintiff's Prior Designation**

Finally, DBBM argues that the designation of all other expert witnesses "by incorporation" ought to be stricken because: (1) the designations were originally made by Geis in his capacity as purchaser of Villaje's claims, not in his individual capacity as a creditor of Villaje, and therefore it was improper for Geis to rely on the prior designations; (2) Geis states that the witnesses named in the prior designation would testify "as to the construction issues and status of construction that relate to the issue of whether overpayments occurred," but the Amended Scheduling Order only permits Geis to designate experts on the issue of solvency; and (3) Rule 26(a)(2)(A) requires a party to identify a person or persons who may testify pursuant to Federal Rules of Evidence 702, 703, or 705; therefore, a statement referring to previously identified witnesses without identifying them directly violates Rule 26(a)(2)(A).[22]

Geis acknowledges that the witnesses previously designated will not testify as to the solvency of Villaje.[23] Rather, Geis asserts that the remaining witnesses designated as experts will "testify as to construction issue[s] relevant to the issue of whether or not Andres was overpaid."[24] Thus, to the

---

[22]Docket no. 90 at 9.

[23]Geis, Glen, and Lindley each appear in Geis's original designation. For the reasons explained in this Order, *supra*, none of them may testify as experts on the issue of solvency. This portion of the Order analyzes whether any of the three may testify as an expert regarding other matters.

[24]Docket no. 93 ¶ 10.

15

extent that a fact issue persists regarding whether Andres was in fact overpaid, he asserted, out of an abundance of caution, that he continues to intend to rely upon those persons as experts in the case.

The Court will not strike the witnesses merely because Geis previously made the designations in his capacity of purchaser of Villaje's claims. The fact that the previous designations were made by Geis while he was essentially asserting Villaje's claims is a mere technicality without significance in this situation. The designation had previously been made, providing DBBM notice of the proposed expert witnesses. Geis simply clarified with his amended designation that he intends to rely on that same designation. The Court does not expect – and DBBM does not argue – that any prejudice, surprise, or undue burden will result. Thus, DBBM's first argument is denied.

Likewise, the Court denies DBBM's second argument, that the Amended Scheduling Order precludes Geis from relying on experts who will not testify regarding solvency issues. Although the Amended Scheduling Order set a date by which Geis was to "FILE his designation of his solvency expert(s), if any," no Order has been entered striking Geis's prior designation. The witnesses identified in Geis's original designation, therefore, remain designated regardless of what the Amended Scheduling Order permits.

Finally, DBBM's argument that Geis cannot designate a witness by referring to previously identified witnesses is wholly without merit. DBBM's suggestion that the Court strike witnesses merely because Plaintiff designated them (or more appropriately, preserved their designation) by incorporating the prior designation by reference is an absurd suggestion without legal support. The case DBBM cites in support, *Malibu Consulting Corp. v. Funair Corp.*, Civil Action No. SA-06-CA-735-XR, 2007 U.S. Dist. LEXIS 58149 (W.D. Tex. Aug. 9, 2007), provides absolutely no support for DBBM's position. The Court concluded in that case that a party cannot designate a corporation

16

as an expert witness, far from the situation presented in this case. *See Malibu Consulting*, 2007 U.S. Dist. LEXIS 58149, at *8. DBBM's third argument is denied.

DBBM also argues that Geis fails to establish that any of the previously designated experts possess "any scientific, technical or specialized knowledge from which to form an opinion on the issue of solvency."[25] While the Court is uncertain as to whether any of the previously designated experts possesses scientific, technical or specialized sufficient to qualify as an expert in any field, the Court denies this objection, again, because Geis does not rely on the prior designation to establish experts on the issue of solvency. Rather, Geis relies on the prior designations to establish these individuals as experts on the issue of overpayments. Therefore, contrary to DBBM's contention, Geis does not need to establish that these individuals are experts on solvency.

DBBM further contends that the previously designated witnesses may not testify as experts because Geis has not established that any of them has "knowledge pertaining to the issue of Villaje's insolvency, or with respect to Plaintiff's fraudulent conveyance claim."[26] Again, to the extent these witnesses were previously designated, Geis intends for those witnesses to testify regarding whether payments to Andres occurring between June 2004 and October 2004 were "overpayments" and not regarding whether Villaje was insolvent during that period. To the extent the individuals are qualified to do so[27], the Court believes their testimony may be relevant to Geis's fraudulent conveyances claim. As an element of the claim, Geis will have to prove that, with each payment to

---

[25]Docket no. 90 at 10.

[26]*Id.*

[27]Again, the issue of these witnesses' qualifications to testify as experts on these matters is not before the Court.

17

Andres, Villaje incurred a corresponding obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation." TEX. BUS. & COM. CODE §§ 24.0005(a)(2), 24.0006(a). Geis's theory of liability rests on the assertion that the alleged "overpayments" were fraudulent conveyances in that, when each payment was made, Villaje incurred a debt for which it did not receive reasonably equivalent value. For each "overpayment," Geis alleges that Andres received more than that which represented the percentage of the construction project Andres completed during the prior pay period (the amount to which Andres was entitled under the construction contract). For example, Geis asserts in the amended complaint that "[t]he effect of Andres' pay requisition no. 15 (and Villaje's request for an advance under the Note) and change order Number 9 was to create an overpayment to Andres of $1,357,257.00, based upon the actual percentage of completion for the Project, for which Villaje received no value."[28] Under this theory, testimony regarding the amount of each payment (and corresponding debt incurred by Villaje), as compared to the percentage of construction completed during the relevant period, will be relevant to whether Villaje received reasonably equivalent value for each transfer to Andres.

The question posed by DBBM's objection, then, is whether Geis has demonstrated that each of the previously designated witnesses has knowledge pertaining to the percentage of construction completed during the relevant time period and whether that percentage corresponds to each respective payment made to Andres during the relevant time period. The descriptions of the proposed testimony contained in Geis's original designation clearly establish that Geis believes Bratton, Neuberger, Geis, and Deason have knowledge on the issue. Geis's descriptions of the proposed testimony of Hornsby, Glen, and Lindley, by contrast, do not specifically cover such issues.

---

[28]Docket no. 31 ¶ 15.

In response to DBBM's motion, other than the failed contention that Glen and Lindley have knowledge relevant to the issue of solvency, Geis does not attempt to clarify in any specific way that Hornsby, Glen, or Lindley's proposed testimony will be relevant to any issues relevant to his fraudulent conveyance claim.[29] Accordingly, Geis has not satisfied his burden of proving that Hornsby, Glen, or Lindley will present expert testimony that is relevant. The designation of Hornsby, Glen, and Lindley must be stricken.

## Conclusion

DBBM's motion to strike (docket no. 90) is GRANTED in part and DENIED in part. The designation of Glen, Lindley, and Hornsby is stricken in full. Geis's designation of Bratton, Neuberger, and Deason shall not be stricken. Geis's designation of himself shall be stricken to the extent Geis intends to testify as an expert on the issue of solvency. Geis's designation of himself shall not be stricken to the extent Geis intends to testify as an expert on the issue of whether Villaje received reasonably equivalent value from each alleged overpayment.

It is so ORDERED.

SIGNED this 8th day of June, 2009.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[29] In fact, Geis in his amended designation seems to recognize that at least some of the witnesses have no such relevant knowledge, stating: "Mr. Geis continues to rely upon the prior designation of experts made in this proceeding, as *many of* those persons will provide testimony as to the construction issues and status of construction that relate to the issue of whether overpayments occurred." Docket no. 88 ¶ 1 (emphasis added).